*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re TAYLOR/STEVENSON, Minors.

UNPUBLISHED
November 5, 2020

Nos. 353293; 353294
Kent Circuit Court
Family Division
LC Nos. 18-053067-NA;
            18-053068-NA;
            18-053069-NA

Before: SAWYER, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother appeals as of right the trial court order terminating her parental rights to her minor children, ST, ET, and SS, under MCL 712A.19b(3)(c)(*i*) and (j). Respondent-father appeals as of right the trial court order terminating his parental rights to his minor children, ST and ET, under MCL 712A.19b(3)(c)(*i*) and (j). For the reasons stated in this opinion, we affirm.[1]

## I. BASIC FACTS

On December 20, 2018, while intoxicated and while ST was present, respondent-mother "disciplined" ET by striking her in the head with a broom. When the broom broke, respondent-mother took the pointed end and stabbed ET in the face with it. ET required stitches and plastic surgery. Respondent-mother was charged with third-degree child abuse, and the children were taken into protective custody on December 26, 2018. On December 27, 2019, petitioner, the Department of Health and Human Services (DHHS), filed a petition seeking temporary custody of the minor children. As it relates to respondent-mother, the petition noted the December 20, 2018 physical abuse of ET and the children's subsequent disclosure of additional physical abuse. As it

---

[1] Although respondent-mother identified the male she believed was SS's father, that individual resisted attempts to establish him as SS's legal father. Consequently, at the time of the termination hearing, SS did not have a legal father. The court terminated the parental rights of any unknown father to her. That aspect of the court's termination order has not been challenged on appeal.

-1-

relates to respondent-father, petitioner noted that he was unemployed, did not have stable housing, and had a criminal history. Respondents waived a reading of the petition at the preliminary hearing.

Subsequently, respondent-mother entered a plea of no-contest to the allegation that she hit ET with a broom and a plea of admission to the remaining allegations in the petition. Based on her plea, the trial court found statutory grounds to take jurisdiction over ET, ST, and SS as it related to respondent-mother.

Respondent-father requested an adjudication trial, during which he testified that he knew respondent-mother would frequently call him while she was "super drunk." He added that respondent-mother got mean when she drank, but he thought that she did not drink around the children since he believed she only called him drunk while the children were asleep. He said he never asked his children about respondent-mother's drinking, never witnessed respondent-mother get "mean" with his children, and never saw any "marks" on them. Respondent-father testified that he had a history of substance abuse, but had received treatment from Catholic Services nine months earlier. He admitted that his housing situation was unstable, explaining that he was living in different hotels every week. Sometimes he would split the cost of the hotel with a female friend. Respondent-father also testified that he received Social Security Income because he had a "bipolar and emotional impairment." He was always able to pay his bills; however, after doing so he struggled to provide for ET and ST. Based on the evidence presented at the adjudication trial, the trial court found statutory grounds to take jurisdiction over ET and ST as it related to respondent-father.

Following the initial dispositional hearing, the trial court ordered respondents to participate in services. Respondent-father did not comply with the conditions of his parenting time. Instead, he would visit ET and SS (who were placed with respondent-father's mother) outside of approved times. Eventually, to stop the contact, respondent-father's mother obtained a personal protection order (PPO) against him, and she also reported him every time he attempted to come over to her house to see the children. Moreover, although respondent-father minimally participated in services at the start of the case, he soon stopped participating in services, appearing at court hearings, and communicating with his caseworker.

Respondent-mother participated in services aimed at addressing her parenting skills and substance abuse. Although she had some visitation with her youngest child, SS, a no-contact order in her criminal case prevented her from having contact with ET and ST. Furthermore, both ET and ST repeatedly stated that they did not want to see respondent-mother. After approximately six months, respondent-mother was incarcerated after pleading guilty to criminal charges arising from her December 20, 2018 assault on ET. While incarcerated, respondent-mother continued to participate in services, but her caseworker did not see any indication that respondent-mother was benefiting from the services received.

On December 19, 2019, the DHHS filed a supplemental petition seeking termination of respondents' parental rights to the children. At the termination hearing, respondent-mother admitted that the physical altercation she had with ET was her fault, and she acknowledged that she had a drinking problem. She expressed her desire to be reunited with the children. Respondent-father testified that he was finally ready to participate in services. Following the

termination hearing, the trial court found statutory grounds to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*) and (j) and it found that termination of respondents' parental rights was in the children's best interests.

## II. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

Respondent-mother argues that the trial court erred by finding statutory grounds to terminate her parental rights to the children. As part of that argument, she contends that the services provided were inadequate because they were not tailored to her mental disability. See *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017). We review for clear error a trial court's finding that statutory grounds exist under MCL 712A.19b(3). *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous if the reviewing court is "left with a definite and firm conviction that a mistake has been made." *In re Gonzales/Martinez*, 310 Mich App 426, 430-431; 871 NW2d 868 (2015). Respondent-mother's challenge to the adequacy of the reunification services was not preserved, however. See *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). Accordingly, we review that issue for plain error affecting respondent-mother's substantial rights. See *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

### B. ANALYSIS

As a general rule, the DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich at 85. "Public entities, such as [DHHS], must make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service' provided." *Id.* at 86 (citation omitted). Reunification are not reasonable unless the DHHS "modifies its services as reasonably necessary to accommodate a parent's disability." *Id.* at 90.

In this case, respondent-mother submitted to a psychological evaluation, which indicated that respondent-mother had a "mild intellectual disability," but "noted that she should not have any barriers with that in regards to completing and being successful in a treatment plan." Respondent-mother's caseworker explained that as a result of the diagnosis, she tailored her discussions and assignments to respondent-mother's disability and made "extra efforts" to ensure that respondent-mother understood what was expected of her. For example, the caseworker testified that the worksheets she sent to respondent-mother were tailored to mother's cognitive ability and were "simple in form and content." Additionally, the caseworker allowed respondent-mother to redo worksheets, sent clarifying instructions on returned assignments, repeated instructions, encouraged respondent-mother to ask questions, and had multiple conversations with respondent-mother in which she explained what was expected of respondent-mother. Given that the record reflects that the services provided were, in fact, tailored to respondent's intellectual disability, there is no merit to respondent-mother's argument on appeal that the services provided failed to reasonably accommodate her disability.

In addition, we discern no clear error in the court's finding that grounds to terminate respondent-mother's parental rights existed under MCL 712A.19b(3)(c)(*i*) and (j). Termination under MCL 712A.19b(c)(*i*) is proper if:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

It is undisputed that more than 182 days elapsed between the issuance of the initial dispositional order and the termination hearing. Further, the record reflects that the conditions leading to the adjudication were respondent's parenting skills and substance abuse. The court found that, despite being offered services to rectified those conditions, neither condition had been rectified.

Regarding respondent-mother's parenting skills, the record reflects that respondent-mother physically abused her children before the start of the case, including the incident where she attacked ET with a broom. During the case, respondent participated in multiple parenting classes. Her caseworker testified however, that respondent-mother continued to demonstrate that she had not benefited from the classes. Respondent-mother indicated on a worksheet she submitted to her caseworker that physical punishment taught children important lessons. Another time, respondent-mother indicated that she never pushed, grabbed, slapped, or threw anything at ET and that she never hit ET so hard that she had marks or were injured. This answer was notwithstanding the fact that ET received stitches and plastic surgery because respondent-mother hit ET with a broom, broke the broom, and then stabbed ET in the face with the broken end. Respondent's caseworker testified that, based on conversations she had with respondent-other and the worksheets submitted by respondent-mother, it was clear that respondent-mother believed that "she was not the factor" in the physical altercation she had with ET. Instead, she blamed the altercation on ET's behavior. The caseworker testified that in light of respondent-mother's "lack of insight and understanding into her parenting skills and appropriate discipline, that the children would be at a great risk of harm of further discipline and further harm" if returned to respondent's care. Although respondent-mother testified at the termination hearing that she now understood that the physical altercation was her fault and that physical discipline was not appropriate, the trial court did not find her testimony credible.

With regard to respondent-mother's substance abuse, the record reflects that respondent abused alcohol. Her caseworker referred respondent-mother to counseling to address her substance abuse and aggression, and respondent-mother's therapist initially reported that respondent-mother was engaging in counseling and making progress. However, after six months of substance abuse counseling, respondent-mother's therapist reported that respondent-mother was still in the beginning stages of treating her substance abuse. Respondent-mother failed to acknowledge that the amount of alcohol she drank was an issue, and she failed to accept that substance abuse negatively impacted her life. Additionally, although respondent-mother's alcohol screenings were negative and she reported that she was abstaining from alcohol, her caseworker received information from people that respondent-mother continued to drink.

Respondent-mother reported that while she was in prison, she attended Alcoholics Anonymous, Narcotics Anonymous, and a substance abuse class. Her caseworker was unable to confirm her attendance at Alcoholics Anonymous and Narcotics Anonymous, but she confirmed that respondent-mother was enrolled in a substance abuse class. The caseworker also sent respondent-mother worksheets regarding substance abuse, which respondent-mother completed and sent them back to her. Respondent-mother provided testimony at the termination hearing that indicated that she had learned how alcohol negatively impacted her life, and she discussed how she planned to maintain sobriety. However, her caseworker repeatedly testified throughout this case that respondent-mother's answers to the monthly assignments indicated that she had not benefited from any of the services. On one assignment, respondent-mother stated that in order to avoid relapsing, she needed to clean, work, and talk to the children. At the termination hearing, the caseworker testified that respondent-mother's answers to the worksheets showed that she had only started to understand her substance abuse and that substance abuse continued to remain a barrier, and the trial court found the caseworker's testimony credible. See *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016). Furthermore, although respondent-mother reported that she was maintaining sobriety in prison, the caseworker testified that prison was a "controlled environment," and it was likely that respondent-mother did not have access to alcohol there. Thus, her sobriety while incarcerated was not proof that she would remain sober upon release.

Finally, the court found that respondent-mother would be unable to rectify the conditions in a reasonable time considering the children's ages. When determining whether a respondent would be able to rectify the conditions that led to termination within a reasonable time, this Court must focus on how long it would take the respondent to rectify the barriers as well as how long the children "could wait for this improvement." *Matter of Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). In this case, at the initial dispositional hearing, ET was 14 years old, ST was 13 years old, and SS was 11 years old. At the termination hearing, each child was a year older. The caseworker testified that ET, ST, and SS needed permanence, stability, and finality and that termination of respondent-mother's parental rights would provide that to them. She indicated that respondent-mother was not close to rectifying the issues in this case, and she explained that it would take six months of services after respondent-mother was released from prison before she could start reuniting respondent-mother with the children. She explained that respondent-mother would have to show that she could remain sober after she was released from prison. She added that respondent-mother had not made enough progress before she was incarcerated to ease the transition process after she was released. The caseworker testified that waiting for respondent-mother to be released from prison and then another six months to work on services would be traumatic for the children.

In sum, based on the record before this Court, we conclude that the trial court did not err by finding that termination was proper under MCL 712A.19b(3)(c)(*i*). Because we hold that the trial court properly terminated respondent-mother's parenting rights under MCL 712A.19b(3)(c)(*i*), we need not determine whether termination under MCL 712A.19b(3)(j) was proper. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).[2]

## III. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondents both argue that the trial court erred by finding that termination of their parental rights was in the children's best interests. Challenges to a trial court's best-interests findings are reviewed for clear error. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

### B. ANALYSIS

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW 2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." See *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court must evaluate each child's best interests individually. *In re Olive/Metts Minors*, 297 Mich App at 42. However, if the best interests of the individual children do not significantly differ, then the trial court need not repeat the same factual findings for each child. *In re White*, 303 Mich App 701, 715; 846 NW2d 61 (2014). The trial court should "consider such factors as the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016) (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714. The focus of this determination is on the child, not the parent. *Schadler*, 315 Mich App at 411.

The trial court did not err by finding that it was in ST's and ET's best interests to terminate respondent-mother's parental rights. The children's placement with their paternal grandmother weighed against termination. See *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). See also MCL 712A.19a(8)(a). However, a trial court may still terminate parental rights if it finds that termination is in the children's best interests, *In re Olive/Metts Minors*, 297 Mich App at 43, and in this case, the other best-interest factors weighed in favor of termination. ST and ET thrived in their grandmother's care, and their grandmother expressed interest in adopting them. Additionally, the record indicates that respondent-mother did not have a bond with either ST or ET. In fact, both ST and ET repeatedly stated that they did not want to have any relationship with respondent-

---

[2] We note that respondent-father has not challenged the trial court's finding that there were statutory grounds to terminate his parental rights to ET and SS. Therefore, we do not review that aspect of the court's order as it relates to respondent-father.

mother . Further, although respondent-mother was not permitted contact with ST and ET for a majority of this case because of the no-contact order in the criminal matter. See *White*, 303 Mich App at 714. When the trial court permitted respondent-mother to contact ST and ET with letters, she only wrote them four letters over a period of seven months. ST and ET also needed permanency, stability, and finality. Although mother had participated in services, she had failed to show a benefit, which meant that it would take six months after her release from prison before her caseworker could even start reuniting her with the children. ST and ET could not wait that long. Thus, based on the record before this Court, the trial court did not err by finding termination of respondent-mother's parental rights was in ST and ET's best interests.

The record also supports the trial court's finding that termination of respondent-mother's parental rights was in SS's best interests. During this case, mother had contact with SS after the no-contact order from the criminal matter was lifted. The parenting visits that respondent-mother had with SS went well, and SS had a bond with respondent-mother and wanted to see her. Additionally, there was no indication that respondent-mother subjected SS to physical discipline. Instead, the record reflects that respondent-mother favored SS over ST and ET.

However, the record also indicates that respondent-mother favoritism toward SS negatively impacted SS's relationship with her sisters. And, although respondent-mother never physically abused SS, the caseworker testified that the abuse in the home still negatively impacted SS, who was aware of the abuse her sisters suffered. Based on respondent-mother's parenting history, the caseworker was concerned that if SS returned to respondent-mother's care, she would also face abuse because she exhibited some of the behaviors that her sisters did and that respondent-mother "identified as the poor behaviors that led to" ST's and ET's abuse. Furthermore, SS's foster-care family was interested in adoption. Although SS told the caseworker that she was interested in a relative placement, the caseworker testified that SS was thriving in her placement, was making improvements in therapy, and was accepting the situation with her family. Therefore, a preponderance of the evidence also supports the trial court's conclusion that termination was in SS's best interests.

The court also did not err by finding termination of respondent-father's parental rights was in ET and ST's best interests. Although respondent-father originally had a bond with both children, respondent-father stopped complying with services, including parenting time, and the children stopped asking about him. The children stated they desired to "maintain a distant relationship" with respondent-father and that they did not want respondent-father to be their caretaker. During the few parenting time visits that he did attend, respondent-father could not demonstrate that he knew how to parent the children. He was unable to redirect them when they fought, he tried to talk to them about inappropriate topics, and he spent most of the visits promising to buy them clothes. Respondent-father also attempted to visit ST and ET while they were at his mother's house even though he knew that was not permitted. His actions led to his mother obtaining a PPO against him.

Respondent-father could not provide ST and ET with the permanency, stability, and finality that they needed. He testified that he was sober, had stable employment, and housing, but because he had not participated in services or maintained contact with his caseworker, his claims were unable to be verified. Additionally, by the termination hearing, respondent-father was incarcerated for committing an assault and battery. Further, despite his history of domestic violence, he refused

services to rectify that barrier to reunification.  In sum, on this record, the trial court did not clearly err by finding termination of respondent-father's parental rights was in his children's best interests.

Affirmed.

/s/ David H. Sawyer
/s/ Michael J. Kelly
/s/ Brock A. Swartzle